Joshua Trigsted
Oregon State Bar ID Number 06531
Trigsted Law Group, P.C.
5200 SW Meadows Rd, Ste 150
Lake Oswego, OR 97035
888-247-4126 xt 1
josh@tlgconsumerlaw.com
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

**OREGON TRAIL EXPEDITORS LLC**,

Plaintiff,

vs.

**CYCLE UP SUPPLY CHAIN SERVICES, LLC**

**&**

**ANTHONY ALBANESE,**

Defendants.

Case No.:

**COMPLAINT**

DIVERSITY

## I. INTRODUCTION

1. This is an action for breach of contract and tortious interference with contract brought by Oregon Trail Expeditors LLC.

## II. JURISDICTION

2. Plaintiff's claims for damages exceed $75,000, and therefore Federal jurisdiction is appropriate pursuant to 28 USC § 1332.

## III. PARTIES

3. Plaintiff Oregon Trail Expeditors LLC ("Plaintiff"), is an Oregon Limited

Liability Company engaged in the business of providing logistics and supply chain services to other businesses, with its principal place of business in Washington County, Oregon.

4. Defendant, CYCLE UP SUPPLY CHAIN SERVICES, LLC, ("Defendant Cycle Up") is a Florida Limited Liability Company engaged in the business of providing logistics and supply chain services to other businesses.

5. Defendant Anthony Albanese ("Defendant Albanese") is an individual that, on information and belief, resides in the State of Georgia. He was the primary contact between Plaintiff and Defendant Cycle Up.

## IV. FACTUAL ALLEGATIONS

6. In or around November, 2022, Plaintiff communicated for the first time with G.A. Paper International, Inc. ("GA Paper"), in the hope of soliciting business from them. GA Paper at that time indicated that it had no need of Plaintiff's services.

7. G.A. Paper International, Inc. ("GA Paper") is a corporation which is incorporated in Canada, and is engaged in the business of supplying and delivering forestry, paper and wood products, with its principal place of business in Ontario, Canada.

8. In or around May, 2023, Plaintiff contacted GA Paper again to solicit business. This time, GA Paper indicated that it did have need of logistics partners and a discussion began involving a potential relationship between the two businesses.

9. In or around June, 2023, Plaintiff and GA Paper agreed to begin a business relationship, wherein Plaintiff would receive product from GA Paper and would be responsible for receiving, storage and shipment of GA Paper's goods delivered to

Savannah, Georgia. Plaintiff and GA Paper around this time signed a written contract providing that Plaintiff would be delivered a minimum of 5000 metric tons per month of product, and that Plaintiff would receive a fee of $750 per shipping container received, and would receive $3.50 per metric ton for each metric ton stored, per month, until shipped.

10. In or around June, 2023, GA Paper indicated to Plaintiff that 5000 metric tons was the floor of business, and that the expected rate of product to be delivered to and shipped to Savannah, Georgia, would likely be in the range of between 10,000 and 30,000 metric tons of goods per month.

11. In or around, June 2023, because Plaintiff did not have its own warehouse operation in Savannah, Georgia, Plaintiff found a subcontractor with access to warehouse space and other necessary logistical products that it did not have, in order to ensure compliance with Plaintiff's agreement with GA Paper. The subcontractor it found was Defendant Cycle Up.

12. The contract for services to be provided by Defendant Cycle Up to Plaintiff was $550 per container and $2.05 cents per metric ton for storage, creating a gross profit on the fundamentals terms of Plaintiff's business with GA Paper of $200 per container received and $1.45 per metric ton stored per month. Given that Plaintiff's was not paying for the actual warehouse space or other logistical products or services related to the deal with GA Paper, this would have resulted in substantial profit for Plaintiff each month. This contract was signed on behalf of Defendant Cycle Up and negotiated directly by Defendant Albanese.

13. GA Paper is a thriving business that, on information and belief, does millions of dollars worth of shipping every month. In the logistics and supply chain business, business relationships typically last multiple years, and can last for tens of years, if things go well. As such, Plaintiff had every reason to expect that if they complied with their contract with GA Paper that the GA Paper account would last for a great while and would generate a large amount of profit for its business.

14. In or around June, 2023, Plaintiff and Defendant Cycle Up entered into a written agreement whereby Defendant would provide subcontractor services that would enable Plaintiff to comply with its contract with GA Paper. Defendant Cycle Up and Plaintiff also separately signed nondisclosure and noncompetition agreements around this time and before work began. The nondisclosure agreement and noncompetition agreements were entered into with the express purpose of avoiding what ultimately happened in this case, which was the poaching of Plaintiff's client by Defendants. The nondisclosure agreements and noncompetition agreements again were negotiated directly by and signed by Defendant Albanese on behalf of Defendant Cycle Up.

15. Plaintiff was aware of the danger that GA Paper would be poached by Defendants, and that is why, in addition to requiring Defendants to sign an NDA and NCA, Plaintiff attempted to keep the identity of GA Paper a secret, and dealt with Defendant as if Plaintiff was the one that required shipping, not Plaintiff's client.

16. On or about July 21, 2023, the first shipment was delivered by GA Paper directly to Defendant Cycle Up as subcontractor, and Defendant Cycle Up provided an

invoice to Plaintiff dated July, 21, 2023. Plaintiff and Defendant Cycle Up's agreement provided for "Net 30" payment, in other words that payment would be due for whatever net amount was due by Plaintiff to Defendant Cycle Up for its services within 30 days of the date of invoice. Therefore, the due date for payment for this shipment would have been August 20, 2023, under said agreement.

17. Defendant made multiple mistakes involving the shipments in July and August, causing Plaintiff substantial additional costs.

18. Despite Plaintiff's best efforts, Defendant Albanese learned that the source of the products was GA Paper sometime prior to August 16, 2023.

19. On or about August 16, 2023, before payment was due on Defendants' first invoice to Plaintiff, Defendant Albanese contacted GA Paper directly in violation of the NDA, and falsely stated to GA Paper that Plaintiff was delinquent on its payments to Defendant Cycle Up. On information and belief, this action and all subsequent actions by Defendants until GA Paper ultimately ceased its relationship with Plaintiff, were calculated by Defendant Albanese to create a rift between GA Paper and Plaintiff that would allow Defendants to poach GA Paper and enter into a relationship with them as a direct client.

20. In order to placate Defendants and avoid a rift with its valuable client GA Paper, Plaintiff made payment to Defendants for the July invoice on August 16, 4 days earlier than required under the agreement.

21. In or around August, 2023, GA Paper promised that a shipment of 1000 Metric Tons would take place in September, 2023.

22. On September 5, 2023, Defendant Albanese, on behalf of Defendant Cycle Up, issued its invoice for the August shipment. Payment for said invoice would have been due in early October, 2023, according to Plaintiff and Defendant Cycle Up's written agreement.

23. On September 13, 2023, Defendant Albanese emailed Plaintiff informing Plaintiff that it would thenceforth be dealing with GA Paper directly because of "nonpayment" by Plaintiff. Plaintiff was current on payments at that time and Plaintiff's payment for the September 5 invoice was not due for approximately 20 days. Defendant Albanese also threatened in this email to intentionally delay the shipment.

24. On or about September 15, 2023, Plaintiff again paid Defendants early for the September 5 invoice, again in order to avoid potential disruption of its relationship with GA Paper.

25. On or about September 18, 2023, Plaintiff received confirmation from Defendant's factoring company that Defendant had received the payment. All services thus had been paid for ahead of schedule by that date.

26. On or about September 21, 2023, Plaintiff received an email from GA Paper indicating that Defendant Albanese, by and through a separate company of his that was hired to do the shipping from the warehouse operated by Defendant Cycle Up, was refusing to ship the cargo and requesting that Plaintiff work with Defendants to ensure that this behavior stops. The implication understood by Plaintiff from the email was that GA Paper would be violating its contacts with its buyers, to its detriment, if the delays continued.

27. On or about October 2, 2023, GA Paper notified Plaintiff that they were withholding payment to Plaintiff until Plaintiff paid Defendant Cycle Up what Plaintiff owed them, even though nothing was owed. It was evident from this that Defendant Albanese, on behalf of Defendant Cycle Up, was intentionally falsely stating to GA Paper that Plaintiff had failed to make payments to Defendants on time. However, as of October 2, and at all relevant times before that, Defendants had been paid in full and ahead of schedule by Plaintiff.

28. In or around October, 2023, GA Paper notified Plaintiff that it was terminating its business relationship with Plaintiff.

29. On information and belief, GA Paper made the decision to terminate its contract with Plaintiff because it had decided to do business directly with Defendants, after a negotiation that took place between Defendants and GA Paper in violation of the nondisclosure and noncompetition agreements signed by Defendants.

30. In or around November, 2024, Plaintiff received an email to which it was evidently mistakenly carbon copied. The email was sent from Defendant Cycle Up to GA Paper and included details of their business relationship. As far as Plaintiff is aware, Defendants and GA Paper continue to do business to this day.

31. It is evident from the foregoing that Defendants' intent from the outset in making intentional errors in its handling of the shipments, in falsely accusing Plaintiff of having failed to pay on time, and in withholding shipping of GA Paper's products, was to create a situation in which it could place the blame on Plaintiff and replace Plaintiff as the

direct client and negotiate a deal directly with GA Paper, where it would be able to charge more and make a bigger profit than it would have through its direct deal with Plaintiff. The fact that these actions began immediately after the shipments started indicates that Defendants in fact never intended to comply with any of the written agreements it signed with Plaintiff, including the nondisclosure and noncompetition agreements, and that their indication that they would was fraudulent.

32. Plaintiff reasonable believes that its relationship with GA Paper, had it not been for Defendants' unlawful actions set out in this Complaint, would likely have lasted for 15 years or more. Such would not be uncommon in the industry. Certainly, Plaintiff did everything in its power to ensure that the relationship would continue, including choosing what it believed was a qualified subcontractor. That Defendant Cycle Up was qualified is indicated by the fact that GA Paper is evidently continuing to use Defendant Cycle Up as its subcontractor to this day. It was only Defendants' unlawful activities as set out herein that prevented a lengthy profitable relationship between Plaintiff and GA Paper.

33. Using internal estimates of the likely average amount of shipping that GA Paper would have sent through Plaintiff for the next 15 years, Plaintiff estimates that the lost profits caused by Defendants' activities in this matter is estimated to be $112,500,000.

## COUNT I: BREACH OF CONTRACT

34. Plaintiff reincorporates by reference all of the preceding paragraphs.

35. The preceding paragraphs state a *prima facie* case for Plaintiff and against

all Defendants for Breach of Contract pursuant to Oregon Law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that judgment be entered against all Defendants, jointly and severally, for the following:

A. Actual damages in the amount of $112,500,000.

B. Costs, disbursements and reasonable attorney's fees for all successful claims, and any unsuccessful claims arising out of the same transaction or occurrence as the successful claims; and,

C. For such other and further relief as may be just and proper.

**COUNT II: FRAUD**

36. Plaintiff reincorporates by reference all of the preceding paragraphs.

37. The preceding paragraphs state a *prima facie* case for Plaintiff and against all Defendants for common law Fraud.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that judgment be entered against all Defendants, jointly and severally, for the following:

A. Actual damages in the amount of $112,500,000.

B. Costs, disbursements and reasonable attorney's fees for all successful claims, and any unsuccessful claims arising out of the same transaction or occurrence as the successful claims; and,

C. Punitive Damages in the Amount of $100,000,000.

D. For such other and further relief as may be just and proper.

**COUNT III: TORTIOUS INTERFERENCE WITH CONTRACT**

38. Plaintiff reincorporates by reference all of the preceding paragraphs.

39. The preceding paragraphs state a *prima facie* case for Plaintiff and against all Defendants for Tortious Interference with Contract.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that judgment be entered against all Defendants, jointly and severally, for the following:

A. Actual damages in the amount of $112,500,000.

B. Costs, disbursements and reasonable attorney's fees for all successful claims, and any unsuccessful claims arising out of the same transaction or occurrence as the successful claims; and,

C. Punitive Damages in the Amount of $100,000,000.

D. For such other and further relief as may be just and proper.

JURY TRIAL DEMANDED

Dated this 27th of February, 2026

By: s/Joshua Trigsted
Joshua Trigsted
Trigsted Law Group, P.C.
5200 SW Meadows Rd, Ste 150
Lake Oswego, OR 97035
888-247-4126 xt 1
josh@tlgconsumerlaw.com
Attorney for Plaintiff